USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: APR 19 2013

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------- X
WILLIAMS TRADING LLC,

                Plaintiff,

        -v-

WELLS FARGO SECURITIES, LLC,

                Defendant.
------------------------------------------------------------- X

12 Civ. 5984 (KBF)

OPINION AND ORDER

KATHERINE B. FORREST, District Judge:

    The smooth functioning of the United States economy depends on predictability in contract construction. Contracting parties need to be able to have confidence that the bargain they strike will be the bargain to which they shall be held. Similarly, parties cannot be made to perform contractual obligations to which they never agreed. Plaintiff here signed a contract that only required defendant to do certain things and no more – by this lawsuit, plaintiff seeks to use a veritable kitchen sink to hold defendant to "more." Neither the law nor the facts support such an outcome. Plaintiff did not sign a contract containing the provisions with which he asserts defendant should have complied. Accordingly, for the reasons set forth below, defendant's motion to dismiss is granted.

I. BACKGROUND

    On this motion to dismiss, this Court assumes as true the allegations in the amended complaint ("Amended Complaint" or "AC") and construes them in favor of plaintiff. Fed. R. Civ. P. 12(b)(6). The Court may also properly consider documents

– such as the two contracts at issue in this case – attached to the complaint or otherwise incorporated by reference. See Chambers v. Time Warner, Inc., 282 F.3d 147, 153 (2d Cir. 2002). To the extent the allegations in a complaint overstate or misread clear contractual language set forth in such a contract, the Court is entitled to refer to the language of the contract for its terms. See, e.g., Sazerac Co. v. Falk, 861 F. Supp. 253, 257 (S.D.N.Y. 1994); accord Rapoport v. Asia Elecs. Holding Co., 88 F. Supp. 2d 179, 184 (S.D.N.Y. 2000).

Williams Trading LLC ("Williams") is a broker-dealer formed in 1997 by David "Tiger" Williams. (ECF No. 17 ("AC") ¶ 11.) At all times relevant to this action, Williams provided an outsourcing trading solution for what was originally a small client base of six hedge funds. (Id.) Over time, it grew to have over 200 clients and offices in Westport, Connecticut, and London, England. (Id.) It essentially functioned as a middleman between clients and the financial markets. (Id. ¶ 13.) From time to time, Williams would use its own capital to facilitate clients' trades or to make markets. (Id.) Its payment structure was based on its clients' market trades. (Id. ¶ 14.) Williams has never been in the business of taking investment positions with in-house funds – otherwise known as proprietary trading. (Id.) Williams' access to in-house capital was limited as was its ability to expand. (Id. ¶ 15.)

Wells Fargo Securities LLC ("Wells Fargo") is a subsidiary of Wells Fargo & Company, a large commercial banking institution. (Id. ¶ 7.)

In 2010, Williams approached Wells Fargo about a potential transaction, which, according to Williams, was to be a joint venture. (Id. ¶ 20.) Discussions ensued and a contract was executed between the parties entitled "Referral Fee and Commission Sharing Arrangement in connection with Hiring of Listed Options Agency Sales Personnel" (the "Agreement"). (AC Ex. A (the "Agreement").) The effective date of the Agreement was September 1, 2010. (Id. at 1.)

During negotiations, the parties discussed Williams' business model and investment strategy. (AC ¶ 23) Williams stressed repeatedly that any joint venture could not be in the business of making proprietary trades with institutional funds or assuming any risk exposure beyond that necessary to facilitate clients' trades. (Id.) Wells Fargo was apparently enthusiastic about Williams' proposal. (Id. ¶ 24.) The parties discussed Wells Fargo's ability to offer clients a broader array of services and act as a one-stop shop for financial services. (Id.) One of the Wells Fargo negotiatiors--Christopher H. Bartlett, Senior Managing Director and head of the equities division of Wells Fargo--stressed that in any event Wells Fargo had no interest in proprietary trading. (Id. ¶¶ 21, 24.) But the Amended Complaint does not allege that defendant ever agreed, committed, or promised not to engage in proprietary trading.[1]

During the negotiations, Wells Fargo referred to the proposed arrangement twice as a joint venture (in May 2010) and once as a strategic alliance (when the arrangement was publicly announced in October 2010). (Id. ¶ 28.) In one email in

---

[1] In fact, the Amended Complaint contains specific allegations that Wells Fargo in fact refused to agree to not engage in such trading. (See AC ¶ 92.)

May 2010, Bartlett for Wells Fargo described "[d]ropping in a team from Williams and forming a partnership (revenue sharing agreement) with [Williams] . . . ." (Id. ¶ 29.)

The parties did, however, discuss creating an arrangement within the Wells Fargo corporate structure and migrating several key Williams' employees over to Wells Fargo to provide operational expertise. (Id. ¶ 30.) In July 2010, a draft of the Agreement was sent to Williams entitled "referral fee and commission sharing agreement" and containing language stating that the relationship between the two companies was that of independent contractors and the agreement was not intended to create a general partnership. (Id. ¶ 31.) In a July 2010 exchange of emails, Williams noticed that language contained in the draft referring to the calculation of profits and losses appeared to contemplate profits and losses relating to proprietary trading. (Id. ¶ 34.) An August 2, 2010, draft changed certain language relating to the calculation of profits and losses but retained breadth and vagueness that allowed for the inclusion of profits and losses relating to proprietary trading. (Id. ¶ 35.) Williams specifically alleges that certain changes that it wanted in the agreement were rebuffed. (Id. ¶ 37.)

Williams also alleges that while it retained outside counsel for certain corporate purposes, it did not retain outside counsel with respect to the negotiations for this agreement. (Id. ¶ 37.) During this period of negotiations, Williams employed the firms of K & L Gates, LLP ("KL Gates") and LeClair Ryan, P.C. ("LeClair"). (Id.) Wells Fargo also used KL Gates and LeClair for certain matters.

4

(Id. ¶ 38.) Williams requested that KL Gates obtain a conflict waiver from Wells Fargo to allow the firm to advise it with respect to the transaction under discussion. (Id.) But in early August 2010, KL Gates notified Williams that Wells Fargo refused to waive the conflict; and Williams received the same response when the same request was made with respect to LeClair. (Id. ¶ 39.) Wells Fargo apparently stated that it would not waive any conflicts as to any firms with which it worked. (Id. ¶ 40.) According to plaintiff, this prevented plaintiff entirely from receiving legal counsel with regard to the agreement under negotiation. (Id. ¶ 41.) The entire legal industry along the Eastern Seaboard was, allegedly, essentially denied to Williams. (See id. ¶¶ 40, 41.)

The Agreement was eventually executed on August 6, 2010. There is no allegation in the Amended Complaint that Williams did not understand what it was signing, that it was forced to sign the Agreement against its will, or that it tried and could not retain the services of any firms with national practices but located outside of the Eastern Seaboard for legal advice. However, Williams does allege that the final and executed version of the contract between the parties "contained all of the misleading edits" Wells Fargo had previously made and which had been noted by Williams in its prior communications with Wells Fargo, as well as certain clauses that Wells Fargo refused to remove. (Id. ¶ 42.)

The Agreement provides:

> This letter agreement (the "Agreement") and the terms and conditions set forth herein shall become effective upon the hiring by Wells Fargo Securities LLC ("Wells Fargo") of certain institutional sales personnel (the

5

> "Employees") associated with agency sales, U.S. listed Options Sales Business (the "Options Sales Business") of Williams Trading, LLC ("Williams Trading").

(Agreement at 1.) And:

> In addition, in consideration for the undertakings and indemnity contained in this Agreement, as well as the agreement by Williams Trading to recommend to its customers that they use Wells Fargo for their listed Options Sales Business, Wells Fargo has agreed to pay Williams Trading a fee (the "Referral Fee) . . . .

(Id.) And:

> In consideration of the agreement by Wells Fargo to offer employment with Wells Fargo to the Employees on such terms as such Employees and Wells Fargo shall mutually agree, and for payment of the Referral Fee, Williams Trading agrees to the following undertakings for the term of this Agreement:
>
> (A) Williams Trading will and will cause its employees and agents to recommend the services of Wells Fargo to any customer or person that approaches Williams Trading or such employee or agent requesting execution of or information about trades in U.S. listed options;
>
> (B) Williams Trading will inform all existing customers of its Options Sales Business that such Employees are now employed by Wells Fargo and, as a result, the Options Sales Business is now being conducted by Wells Fargo, independently of Williams Trading, and recommend that such customers use Wells Fargo for their business in listed options going forward;

(Id. § 4.) In addition, Williams represented that it understood that it was bound by the terms of the Agreement. (Id. § 5(A)). And, the Agreement contained a standard merger clause. (See id. § 11 ("This Agreement contains the entire understanding between the parties concerning the subject matter of this Agreement . . . .").)

Finally, the Agreement stated:

> Wells Fargo's relationship to Williams Trading is that of an independent contractor and not a partner or employee. This Agreement is not intended to nor shall it be deemed to create a general partnership or other type of partnership in the legal and tax meaning of the term.

(Id. § 16.)

Things did not go well between the parties once the Agreement was signed. Wells Fargo engaged in proprietary trading; and it did not acquire (or at least not acquire quickly enough) needed software and equipment to allow for the seamless transition of the Williams Trading customers. (See, e.g., AC ¶¶ 57, 60, 62, 66.) Indeed, according to plaintiff, the transition was nearly a disaster. (Id. ¶ 67.) While Wells Fargo had consulted with "Tiger" Williams early on, it began to cut him out of the decision making process shortly thereafter. (Id. ¶ 74.) Moreover, various of Williams' former customers stopped or reduced the amount of business they brought to Wells Fargo. (Id. ¶ 79.)

Wells Fargo's proprietary trading reduced amounts that would have been payable to Williams had it not taken certain risks and suffered certain losses with respect thereto. (Id. ¶¶ 84, 89.) At various times subsequent to the execution of the Agreement, plaintiff alleges that Wells Fargo misrepresented to Williams the amount of proprietary trading in which it continued to engage. (Id. ¶ 100.)

The parties terminated their Agreement on January 9, 2012, in a document referred to as an "Amendment and Termination Agreement" (the "Termination Agreement"). (Id. ¶ 112.) Williams Trading asserts that it entered into the

Termination Agreement based on misinformation it had received in the form of ongoing profit and loss reports. (Id. ¶ 112.)

The Termination Agreement is a single page document and states that it "supersedes all prior discussions, communications and agreements relating to the termination of the Agreement." (AC Ex. B.) It further provides that:

> Wells Fargo has performed the Referral Fee calculation according to the Agreement's terms and determined that no Referral Fee is owed for September 1 – December 31, 2011 time period. Williams Trading agrees with that determination and that Wells Fargo has no further obligation for payment of any Referral Fee pursuant to the Agreement and that it is not entitled to the payment of any Referral Fee as the result of the Agreement's termination.

(Id., § 4.)

## II. PLAINTIFF'S CLAIMS

Plaintiff commenced this lawsuit in August 2012. It then amended its complaint on October 26, 2012. (ECF No. 17.) In its Amended Complaint, plaintiff asserts the following collection of claims – all of which are based on the same underlying conduct:

1. Breach of fiduciary duty: the Agreement created a joint venture; Wells Fargo therefore had fiduciary obligations to plaintiff which it breached.

2. Breach of contract: Wells Fargo had an obligation under the Agreement not to engage in proprietary trading but did so anyway; Wells Fargo also had an implied duty to cooperate with "Tiger" Williams in the management of the listed options

desk and it failed to do so; Wells Fargo also failed to disclose material information regarding the technological build out of the listed options desk.

3. Breach of implied covenant of good faith and fair dealing: there was an unwritten agreement between the parties to create a joint venture; such unwritten agreement contained duties to act in good faith and deal fairly; in addition, the Agreement required cooperation in the management of the listed options desk which defendant failed to do; defendant also breached its duties by implementing infrastructure that inhibited communications with clients and other investment desks at Wells Fargo, and it further breached its duties by arranging for third-party clearing services at a prohibitively and unreasonably high rate.

4. Fraud: defendant made false representations to plaintiff in order to induce plaintiff to continue in the operation of the listed options desk; it made false representations in connection with the technological buildout and to integrate the listed options desk with other client facing desks; according to plaintiff, had it known of these misrepresentations at the time, it would not, <u>inter alia</u>, have entered into the Termination Agreement.

5. Fraudulent inducement: defendant made false representations to plaintiff regarding its intent not to conduct proprietary trading that induced it into entering into the Agreement.

6. Fraudulent inducement of the Termination Agreement: defendant made false representations as to the nature and extent of the listed options desk's profits and losses caused by its proprietary trading; had plaintiff known about such

misrepresentations, plaintiff would not have entered into the Termination Agreement.

7. Negligent misrepresentation: prior to the execution of the Agreement defendant negligently made the same misrepresentations alleged.

8. Tortious interference with existing contracts: defendant's defective performance of the Agreement interfered with plaintiff's relationships with clients.

9. Tortious interference with business relations: plaintiff makes the same allegations as set forth in paragraph 8 directly above.

10. Unjust enrichment: defendant Wells Fargo has been unjustly enriched by its activities in connection with the Agreement, the unwritten joint venture agreement or the Termination Agreement.

III. STANDARD OF REVIEW

To survive a Rule 12(b)(6) motion to dismiss, "the plaintiff must provide the grounds upon which [its] claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). In other words, the complaint must allege "enough facts to state a claim to relief that is plausible on its face." Starr v. Sony BMG Music Entm't, 592 F.3d 314, 321 (2d Cir. 2010) (quoting Twombly, 550 U.S. at 570). See also Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 1949 (2009) (same). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."

10

.

Iqbal, 129 S. Ct. at 1949. In applying that standard, the court accepts as true all well-plead factual allegations, but does not credit "mere conclusory statements" or "threadbare recitals of the elements of a cause of action." Id. If the court can infer no more than "the mere possibility of misconduct" from the factual averments--in other words, if the well-pleaded allegations of the complaint have not "nudged claims across the line from conceivable to plausible," dismissal is appropriate. Twombly, 550 U.S. at 570; Starr, 592 F.3d at 321 (quoting Iqbal, 129 S. Ct. at 1950).

## IV. LAW RELATING TO CONTRACT INTERPRETATION

New York law provides that courts should enforce the plain meaning of contracts when that meaning is clear and unambiguous. Greenfield v. Philles Records, 98 N.Y.2d 562, 569 (2002). Courts should look at a contract as a whole, giving effect to provisions in their totality, in order to construe its plain meaning. See LaSalle Bank Nat. Ass'n v. Nomura Asset Capital Corp., 424 F.3d 195, 206 (2d Cir. 2005).

## V. DISCUSSION

While brought pursuant to disparate legal theories, each of plaintiff's claims fails for one or more of the following reasons: (1) plaintiff either asserts that the Agreement or Termination Agreement created obligations which, on their face, those contracts simply did not create (e.g., there is not a prohibition against proprietary trading, nor any obligation to cooperate on management, nor any obligation to provide particular technical support or disclose technical matters, nor any obligation to provide for particular communication or interaction with other

"client facing" pieces of Wells Fargo's operations); (2) plaintiff asserts it was misled about facts as to which its own allegations make it clear it had specific notice and which, it specifically alleges, the broad contract language allows (e.g., a broadly drafted provision for payment of fees allows for the inclusion of profits and losses from proprietary trading); and (3) plaintiff specifically agreed that both agreements constituted the entire understanding and agreements of the parties as to their subject matter, it represented it knew what it was doing, and insofar as the Termination Agreement was concerned, it understood how defendant had calculated the payment and that no further payment was due.

First to Third Causes of Action

By its clear and unambiguous terms, the Agreement did not create a joint venture. The Agreement is limited in scope – and is a contract for payment of referral fees in connection with the hiring of certain personnel and recommendations made to certain clients.[2] Despite what may have been discussed in the spring before the Agreement was executed (in which apparently defendant used the term joint venture twice), the arrangement between the parties reflected in the Agreement lacks any attributes of a joint venture. See, e.g., PB Americas Inc. v. Continental Cas. Co., 690 F. Supp. 2d 242, 248 & n.2 (S.D.N.Y. 2010) (citing Itel Containers Int'l Corp. v. Atlanttrafik Express Serv. Ltd., 909 F.2d 698, 701 (2d Cir. 1990)). For instance, nothing in the Agreement provided plaintiff with any right of input – let alone control – over the Wells Fargo options trading desk, further

---

[2] See Physicians Mut. Ins. Co. v. Greystone Servicing Corp., 07 Civ. 10490, 2009 WL 855648, at *5, *10 (S.D.N.Y. Mar. 25, 2009) (no fiduciary relationship where parties' agreement disavowed a partnership and designated defendant as an independent contractor).

12

undermining any notion of a joint venture. See Stratford Group, Ltd. v. Interstate Bakeries Corp., 590 F. Supp. 859, 863 (S.D.N.Y. 1984); Allen Chase & Co. v. White, Weld & Co., 311 F. Supp. 1253, 1260 (S.D.N.Y. 1970).

Further, by its terms, the Agreement was the "entire understanding between the parties concerning the subject matter of the Agreement." No implied or actual joint venture was created (the Agreement makes that explicit) in paragraph 16; no promises were made with respect to proprietary trading that were then embodied in the contract; no promises were made regarding technology platforms that would be used, the type of communication that the listed options desk would have with other parts of Wells Fargo, or that "Tiger" Williams would have any input into the management of the options trading desk at Wells Fargo at all. The absence of any contractual terms which defendant breached,[3] combined with a merger clause clearly stating that the Agreement represented the entire understanding of the parties, requires dismissal of plaintiff's First,[4] Second and Third[5] Causes of Action.

---

[3] To state a claim for breach of contract, plaintiff must allege the existence of a contract, which was breached by the other party, and which breach caused damages. See Terwilliger v. Terwilliger, 206 F.3d 240, 245-46 (2d Cir. 2000). No contractual provisions provide for the obligations here plaintiff claims were breached.

[4] See Northeast Gen. Corp. v. Wellington Adver., Inc., 604 N.Y.S.2d 1, 4 (1993) (whether a fiduciary relationship is created is determined by the services the parties agreed would be provided). No facts support the existence of a fiduciary relationship.

[5] Claims for breach of the implied covenant of good faith and fair dealing are duplicative of breach of contract claims; to the extent they rely here on the Agreement they are therefore dismissed for the same reason. See Rojas v. Don King Prods., Inc., 11 Civ. 8468, 2012 WL 760336, at *4 (S.D.N.Y. Mar. 6, 2012). To the extent these obligations purport to arise in the context of another, unwritten joint venture agreement, they fail due to the unambiguous integration clause in the Agreement: there are no plausible allegations of an enforceable unwritten joint venture agreement.

Fourth to Ninth Causes of Action

In its Fourth Cause of Action, plaintiff claims that defendant committed fraud[6] regarding the extent of its proprietary trading to induce plaintiff to <u>continue</u> participating in the operation of the listed options desk. This claim is based on a false premise: it assumes that a formal arrangement existed pursuant to which plaintiff had to continue to participate in the listed options desk (or even had a contractual right to). In fact, plaintiff had no obligations to manage the desk, or even any right to do so. Its only obligations were those set out in the Agreement. Thus, plaintiff cannot have been fraudulently induced to <u>continue</u> to do that which it was not obligated to do and had no right to do in the first place.

In addition, however, the Amended Complaint simply does not plausibly allege any false representation in the first place, nor that that false representation was made with scienter[7]--there are no plausible allegations that defendant told plaintiff any falsehood (or that defendant did so intentionally or recklessly, or that plaintiff could have reasonably relied on such a statement). Plaintiff affirmatively asserts that it <u>knew</u> that defendant could engage in proprietary trading – the compensation forumula was broad enough to allow for it, though plaintiff did not want it to occur – <u>i.e.</u>, the issue was known, and discussed. Nothing in the Agreement prohibited proprietary trading. (Again, as the Agreement stated, it

---

[6] Under New York law, the elements of common law fraud are a material false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing plaintiff damage. See <u>Chanayil v. Gulati</u>, 169 F.3d 168, 171 (2d Cir. 1999).

[7] <u>Cf. In re Wachovia Equity Sec. Litig.</u>, 753 F. Supp. 2d 326, 380 (S.D.N.Y. 2011) (equating scienter element applicable to common law fraud to securities laws).

represented the entirety of the agreement and understanding between the parties.) Plaintiff knew that the Agreement contained the language it did – and chose to proceed anyway.[8] Thus there are insufficient plausible allegations of a false statement, of an intentionally false statement, or of an intentionally false statement that plaintiff could have reasonably relied upon. Had plaintiff wanted certain assurances to the contrary before proceeding, it could have sought a specific representation or warranty in the Agreement itself.

Plaintiff also asserts fraudulent representations in connection with the technical buildout and the integration of the listed options desk with other of Wells Fargo's client facing operations. However, throughout the Amended Complaint, plaintiff states actual and growing awareness of these issues; indeed, its knowledge of these issues is asserted to be the reason for termination of the Agreement. Thus, plaintiff's fraud claims based on these representations fail for the same reasons as that based on the representations concerning proprietary trading.

Plaintiff's claims for fraudulent inducement of the Agreement (Fifth Cause of Action) and fraudulent inducement of the Termination Agreement (Sixth Cause of Action) must therefore also fail.[9] Plaintiff cannot have been fraudulently induced to

---

[8] This Court disregards plaintiff's assertion that it was unable to retain counsel because Wells Fargo had "conflicted out" all counsel on the Eastern Seaboard. First, plaintiff knew how to obtain counsel when it wanted to bring this lawsuit, there are thousands of lawyers across the country that plaintiff could have hired. And second, plaintiff was in all events not required to enter into the Agreement in the first place.

[9] See Apple v. Atlantic Yards Dev. Co., LLC, 08 Civ. 3508, 2009 WL 528620, at *4 (S.D.N.Y. Mar. 3, 2009) (claims for fraudulent inducement fail when allegations do not support a strong inference of scienter). Plaintiff's fraudulent inducement claim also fails as simply duplicative with its claim for breach of contract. See Rojas, 2012 WL 760336, at *4-5; see also Sichel v. Unuum Provident Corp., 230 F.Supp.2d 325, 328 (S.D.N.Y. 2002).

enter into the Agreement when it had flagged and discussed an issue and knew that the contract allowed for precisely the issue flagged. The integration clause in the Agreement erased Williams' ability to later rely on any of the earlier conversations or statements as part of the understanding it had on entering into the Agreement. Moreover, and again, plaintiff knew the truth of the allegedly false representations when negotiating the Agreement.

There are also insufficient allegations of falsity and scienter with respect to the Sixth Cause of Action – fraudulent inducement into the Termination Agreement. That Agreement also contains an integration clause. Plaintiff asserts that while it knew of some proprietary trading, it did not know the extent of the profits and losses. But there are no plausible allegations that as the parties were parting ways, defendant made consciously or recklessly false statements in order to obtain plaintiff's execution of the Termination Agreement. Rather, the allegations support a mutual parting of the ways based on a number of disagreements, including proprietary trading activity. Notably, the final paragraph of the Termination Agreement contains an explicit agreement by the parties that plaintiff knew the formula that defendant had used to calculate whether a payment needed to be made – and agreed no payment was required. There is no doubt that at the time of termination, one of plaintiff's most significant issues was the level of proprietary trading. Thus, on the basis of such factual allegations, there is no plausible basis to anchor the falsity or scienter elements for this cause of action.

Plaintiff's attempt to cast the same conduct as a negligent misrepresentation (Seventh Cause of Action) fares no better.[10] Defendant did not breach a duty to speak when the very issue as to which plaintiff claims misrepresentations were made was discussed, and was known to be an ongoing danger based on the breadth of the contractual language.

Plaintiff's claims for tortious interference with contract and business relations also fail.[11] The Agreement specifically anticipated referrals of plaintiff's customers to defendant. Plaintiff cannot now bring an action against defendant for doing precisely that which it said it was going to do: servicing plaintiff's former customers. As a matter of law therefore, based on the terms of the Agreement, defendant could not unlawfully have interfered with plaintiff's contracts or business relations.

Plaintiff's separate claims with respect to the Termination Agreement must also be dismissed. The allegations of the Amended Complaint recount in detail plaintiff's awareness of, and disagreement with, defendant's proprietary trading

---

[10] A claim for negligent misrepresentation requires that a defendant had a duty, as a result of a special relationship, to give correct information; the defendant made a false representation that he knew or should have known was incorrect; the information supplied was known by the defendant to be desired by the plaintiff for a serious purpose; the plaintiff intended to rely and act upon it; and the plaintiff reasonably relied to his detriment. Anschutz Corp. v. Merrill Lynch & Co., 690 F.3d 98, 114 (2d Cir. 2012). A claim for negligent misrepresentation cannot be premised on a duty arising from a contract; the duty must be independent of the contact. See Stan Winston Creatures, Inc. v. Toys "R" Us, Inc., 2004 WL 1949071 (Sup. Ct. N.Y. Cty. 2004).

[11] Tortious interference with contract requires that there be a contract between plaintiff and a third party, defendant's knowledge of that contract, defendant's intentional inducement of the third party to breach the contract, and damages to plaintiff. See Kronos, Inc. v. AVX Corp., 81 N.Y.2d 90, 94 (1993). Tortious interference with business relations requires that defendant interfere with a specific business prospect, that the defendant acted wrongfully and that but for defendant's wrongful actions, the business would have been plaintiff's. See Carl v. Cohen, 868 N.Y.S.2d 7, 8 (1st Dep't 2008).

17

and each of defendant's other alleged failings in connection with the listed options desk. When plaintiff executed the Termination Agreement, it did so knowing of these issues. Nevertheless, plaintiff agreed that the Termination Agreement superseded all discussions, communications and agreements between the parties; and it stated that plaintiff knew that Wells Fargo had calculated the referral fee and it specifically agreed that it was not entitled to further payment. No allegations plausibly support anything other than a knowing and voluntary entry into the Termination Agreement by plaintiff; far from being defrauded or fraudulently induced, it entered into the Termination Agreement precisely because of – and after months of complaining about – that very conduct.

Tenth Cause of Action

Finally, plaintiff cannot assert an unjust enrichment claim in the face of the plain language of the Termination Agreement regarding no further payment.[12] Plaintiff agreed to this provision with specific knowledge about the proprietary trading activities.

CONCLUSION

For the reasons set forth above, defendants' motion to dismiss is granted and plaintiff's claims are dismissed with prejudice. After seeing defendant's arguments in support of its initial motion to dismiss, plaintiff amended its complaint. As set

---

[12] Unjust enrichment is a quasi-contract theory of recovery. It is unavailable where a contract covers the same subject matter – as here. See Clark-Fitzpatrick, Inc. v. L.I.R.R. Co., 521 N.Y.S.2d 653 (1987); see also Simington v. Lease Fin. Grp., LLC, 10 Civ. 6052, 2012 WL 651130, at *10 (S.D.N.Y. Feb. 28, 2012).

forth above, the plain terms of the contracts at issue eliminate the basis for any of the claims asserted. Accordingly, further amendment would be futile.

The Clerk of the Court shall close the motion at ECF No. **19** and terminate this action.

SO ORDERED.

New York, New York
April 19, 2013

_____
Katherine B. Forrest
United States District Judge